**Lehman OLSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–10597.

Court of Appeals of Alaska.

Sept. 2, 2011.

Brooke V. Berens, Assistant Public Advocate, and Rachel Levitt, Public Advocate, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

COATS, Chief Judge.

Lehman Olson was convicted of assault in the third degree for assaulting his wife, Pamela Olson. He was also convicted of tampering with a witness, failure to appear, unlawful contact in the first degree, and two counts of violating his conditions of release on a felony charge. These latter charges arose from his conduct while on bail release pending the assault charge.

On appeal, Olson contends that the superior court erred in denying his motion to sup-

press statements he made to the police. He argues that the State did not show that he waived his *Miranda* rights. Although the superior court found that this issue was close, it ultimately concluded that the record was sufficient to show that Olson knowingly and intelligently waived his rights. We uphold the superior court's decision.

Olson also contends that the superior court erred in denying his mid-trial motion for a continuance. We conclude that the superior court did not abuse its discretion in denying the motion.

*Factual and procedural background*

Lehman and Pamela Olson had an altercation on the evening of June 2, 2007. According to Pamela's trial testimony, she left the house after Olson slapped her. She went to a friend's house with their children. Pamela and her friend, Melanie Blazka, then drove back to the Olson home to retrieve some belongings. The children and Blazka waited in the car while Pamela went inside to get her things. Pamela testified that Olson grabbed her by the neck and threw her on the floor several times. She threw her cell phone off the balcony and told Blazka to call 911. Blazka did. Olson followed Pamela onto the balcony and lifted her up by her neck and threw her down again. Pamela was four months pregnant at the time. Olson left, and Pamela stayed on the balcony until the police arrived.

The police obtained a warrant for Olson's arrest. Later that night, Anchorage Police Officer Samuel Flack stopped Olson, confirmed his identity, arrested him, placed him in the back of his patrol car, and drove him to the Anchorage jail. In the patrol car, before interrogating Olson about the assault, Officer Flack advised Olson of his rights from a state-issued *Miranda* card. Olson indicated that he understood his rights. Officer Flack then questioned Olson about the assault, and Olson made incriminating admissions.

*Why we uphold the decision of the superior court that Olson knowingly and voluntarily waived his Miranda rights*

Before trial, Olson moved to suppress the statements he made to Officer Flack when Flack interrogated him about the assault. As we previously explained, Flack interviewed Olson in the patrol car before taking him to the jail. Flack recorded the conversation, which was played in court at a hearing on Olson's motion to suppress.

Officer Flack began the interview by saying, "The rules are kind of strict when I want to have a conversation with you and you're in my car, I have to read you *Miranda*. Only because, that's the way the rules are. You understand that?" Flack continued, "I'm going to go ahead and read you *Miranda*, and that way we are allowed to have our conversation without me getting in trouble." Flack then read from the *Miranda* card:

> Mr. Olson, you have the right to remain silent, anything you say can and will be used against you in a court of law, you have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. You understand each of these rights that I've explained to you?

Olson answered, "Yes." Flack did not read the last sentence from the *Miranda* card, which states: "Having these rights in mind, are you willing to talk to me?" Flack then paused for about fourteen seconds during which time Olson did not speak. Following this pause, Flack began questioning Olson. During the conversation, Olson made incriminating statements. In particular, Flack testified at trial that Olson admitted to slapping his wife and placing her in a headlock "because she was out of control."

Superior Court Judge John Suddock conducted the evidentiary hearing on Olson's motion to suppress. The recording of Olson's statements was played at the evidentiary hearing. In addition, Officer Flack testified that he had been trained that he did not have to ask the last question on the *Miranda* card. He testified that, based on that train-

ing, he did not ask suspects for a waiver by reading this sentence.

Judge Suddock reserved ruling on the motion to suppress to give the defense an opportunity to file a brief addressing the officer's failure to read the last line of the card.

The motion was ultimately decided by Superior Court Judge Michael Spaan, who issued a written order denying the motion to suppress. In the order, Judge Spaan found that:

> [Olson] was administered *Miranda* warnings but was not read the final sentence on the *Miranda* card which reads, "Having these rights in mind are you willing to talk to me?" Officer Flack simply read the rights, purposefully omitted the question, and asked if [Olson] understood them to which [Olson] responded in the affirmative. Officer Flack testified that he was trained not to read the questions asking if the suspect would waive his rights.

Looking at the totality of the circumstances, Judge Spaan found that Olson "provided a voluntary, knowing and intelligent waiver":

> [Olson] was cooperative with Officer Flack during the interview. [Olson] provided clear answers to questions and provided information that had not been requested. More importantly, [Olson] was read each of his rights off of the issued card and then specifically asked by Officer Flack if [he] understood those rights. [Olson] clearly stated that he understood and then proceeded to talk to the officer. Further support for the conclusion that Olson knowingly, intelligently and voluntarily waived his rights is his statement during the interview, "Let's stop talking about this." This statement indicates that Olson understood that he had the right to silence, but chose to continue talking to the officer immediately after making this statement.

Judge Spaan concluded: "While no express waiver was given, the defendant's actions after he affirmatively stated that he under-

stood his rights point to a knowing and intelligent waiver by a preponderance of the evidence."

Judge Spaan also stated that the case was "a close case that could have led to the court suppressing [Olson's] statement." He was concerned by "Officer Flack's statement that it is his practice to not read the final warning on the card." Judge Spaan remarked that Officer Flack's statement that he "needed to read Olson his *Miranda* rights so that the officer would not get in trouble is misleading and minimizes the importance of the warnings."

 Both the United States and the Alaska Constitutions require that, prior to a custodial interrogation, a suspect be informed of his right to remain silent and his right to counsel.[1] The State must show, by a preponderance of the evidence, that the suspect waived these rights *Miranda* rights.[2] Here, the State presented evidence that Olson knew and understood his *Miranda* rights. Officer Flack told Olson that: (1) he had the right to remain silent; (2) anything he said could and would be used against him; (3) he had the right to the presence of a lawyer; (4) if he could not afford a lawyer, one would be provided to him; and (5) he could decide at any time to exercise any of these rights. These are the *Miranda* warnings.[3] Olson responded with a clear "yes" when Officer Flack asked him if he understood these rights. We conclude that the record supports Judge Spaan's conclusion that Olson was sufficiently informed of his *Miranda* rights.

 The harder question, as Judge Spaan recognized, is whether the record shows that Olson knowingly and voluntarily waived those rights. Although it is clear that a valid waiver of *Miranda* rights may be inferred from the circumstances of an interrogation, it is less clear what circumstances constitute

**1.** U.S. Const. amend. V; Alaska Const. art. I, § 9; *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966); *Munson v. State*, 123 P.3d 1042, 1045–46 (Alaska 2005).

**2.** *Giacomazzi v. State*, 633 P.2d 218, 222 & n. 4 (Alaska 1981); *Forster v. State*, 236 P.3d 1157, 1161 (Alaska App.2010).

**3.** *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602; *State v. Cassell*, 602 P.2d 410, 412 n. 4 (Alaska 1979).

such a waiver.[4] Addressing the question of whether a defendant's understanding of *Miranda* warnings, followed by an incriminating statement, amounts to "a showing of 'an understanding of his rights and a course of conduct indicating waiver,'" Professor LaFave notes:

> The point ... is that an understanding of rights and an intention to waive them are two different things, and the latter should not be inferred merely because the former is now clearly established. That is true, yet when it is clear the defendant does understand his rights it is somewhat easier to make some judgments about the significance of his subsequent conduct in terms of whether or not those rights are being invoked.

> Thus, while an acknowledgment of understanding should not inevitably carry the day, it is especially significant when defendant's incriminating statement follows immediately thereafter.... [C]ourts have also taken into account the fact that the defendant initiated the conversation which occurred after the warnings were given and that the defendant's contact with the police was attributable to his cooperation. Moreover, a finding of waiver is likely when the defendant has engaged in certain conduct falling a bit short of an express waiver, such as a declaration of a cooperative attitude or even a nod or a shrug.[5]

LaFave points out that the United States Supreme Court recently held, in *Berghuis v. Thompkins*,[6] that a suspect who receives and understands the *Miranda* warnings and does not invoke his *Miranda* rights waives those rights if he makes an uncoerced statement to the police. LaFave suggests that *Berghuis* "largely swept aside" limitations on the implied waiver rule.[7] It therefore appears that under the current federal rule, Olson's conduct was sufficient to show an implicit waiver of his *Miranda* rights.

■ Olson points out that Alaska appellate courts are free to be more protective of individual rights than is required by federal standards. In *Munson v. State*,[8] the Alaska Supreme Court declared that it could grant more protection than federal constitutional law based upon article I, section 9 of the Alaska Constitution.[9] The supreme court noted that, although the wording of article I, section 9 is "virtually identical" to the Fifth Amendment, the supreme court has interpreted it more broadly than the United States Supreme Court has interpreted the Fifth Amendment.[10]

■ In this case, we need not decide whether Alaska will follow the rule in *Berghuis*. There is prior Alaska authority which holds that a court may infer a waiver of rights from the circumstances surrounding the interrogation.[11] In some cases a waiver of *Miranda* rights "can be clearly inferred from the actions and words of the person interrogated."[12] Judge Spaan found that Officer Flack read Olson his rights and that Olson responded that he understood those rights. Judge Spaan also found that Olson volunteered information that Officer Flack had not requested. Furthermore, Judge Spaan concluded from the circumstances of the interview that Olson was cooperative. This record supports Judge Spaan's conclusion that a knowing and intelligent waiver of *Miranda* rights can be inferred from Olson's actions and words during the interview.

4. *See* 2 Wayne R. LaFave, *Criminal Procedure* § 6.9(d) at 831 (3d ed. 2007).

5. *Id.* at 832.

6. —— U.S. ——, 130 S.Ct. 2250, 2264, 176 L.Ed.2d 1098 (2010).

7. 2 Wayne R. LaFave, *Criminal Procedure* § 6.9(d), pocket part at 75 (Supp. 2010–11).

8. 123 P.3d 1042 (Alaska 2005).

9. *Id.* at 1048 n. 48.

10. *Id.* (citing *Biele v. State*, 371 P.2d 811, 813 n. 6 (Alaska 1962) and *Scott v. State*, 519 P.2d 774, 785 (Alaska 1974)).

11. *Pierce v. State*, 627 P.2d 211, 217 (Alaska App.1981); *McMahan v. State*, 617 P.2d 494, 499 (Alaska 1980).

12. *McMahan*, 617 P.2d at 499 (Alaska 1980) (quoting *North Carolina v. Butler*, 441 U.S. 369, 375–76, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979)).

*Why we conclude Judge Spaan did not err in denying Olson's motion for a mid-trial continuance*

■ During Olson's trial, an incident arose concerning Pamela Olson, Olson's wife and the victim of his assault. Pamela had been staying with Jeremy and Virginia Baker. After Pamela testified for the State against Olson on May 27, the Bakers asked her to leave. The defense had talked to Mr. Baker about testifying. Pamela and her friend Melanie Blazka, along with another individual named Mark Martin, went back to the Bakers' house on Thursday, May 28, to retrieve Pamela's belongings. A confrontation ensued between Pamela, Blazka, Martin, and the Bakers. As a result of what happened that evening, Martin was arrested.

At trial, Olson asked for a two-day continuance to investigate the incident. He stated that Olson's sister was afraid to testify because of what had happened. He stated that Martin's testimony about the incident might raise Fifth Amendment concerns. He also alluded to potential admissible evidence showing that Pamela (and Blazka) had a pattern of picking fights with people, calling the police, and having them arrested.

Judge Spaan indicated that he did not see why a continuance was necessary. He denied the continuance request.

Olson ultimately presented Pamela as a witness and asked her about the incident. Baker and Olson's sister also testified for the defense.

■ Olson argues that Judge Spaan erred in denying his motion for a mid-trial continuance. But a trial judge has broad discretion to deny such a request.[13] Olson had the weekend to investigate the incident. He was able to call Pamela and the Bakers to testify about the incident. In fact, he had the opportunity to question many witnesses about the incident. After he presented his evidence and explored the incident, he did not renew his continuance request or otherwise suggest to the trial court that he had been prejudiced. He has not shown on appeal how he was prejudiced.

We conclude that Judge Spaan did not abuse his discretion in denying the motion for a mid-trial continuance.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

**13.** *Nielsen v. State,* 623 P.2d 304, 307 (Alaska 1981).