**Yuri BEREZYUK, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10192.**

Court of Appeals of Alaska.

Aug. 3, 2012.

19. *The American Heritage Dictionary of the English Language* 1990 (3d ed. 1992).

20. *Black's Law Dictionary* 1598 (8th ed. 2004).

Sarah T. White, contract attorney for the Public Defender Agency (opening brief), Tracey Wollenberg, Assistant Public Defender (reply brief), and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Mary A. Gilson, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

In the early morning of February 23, 2004, Anchorage Airport Police Officer Joseph Ga-

mache spotted two young men in the terminal whom he recognized as suspects in the shoplifting of a camera from one of the airport stores the previous evening. These two men were the defendant, Yuri Berezyuk, and his brother Ivan.

Gamache summoned two other officers to back him up, and then he made contact with the young men. He told the brothers that he needed to speak with them. He then asked them to bring their bags (each brother had a duffle) and to come with him to the police substation in the terminal. Gamache subsequently moved Yuri to the nearby lost and found office, so that he could question the brothers separately about the stolen camera.

Ivan told Gamache that *he* had stolen the camera, and that his brother Yuri had nothing to do with it. But a few minutes later, when Gamache questioned Yuri Berezyuk about the shoplifting, Berezyuk confessed that he was the one who had stolen the camera, and he told Gamache that the camera and its docking station were in his duffle.

Gamache asked Berezyuk for permission to search the duffle, and (according to the facts as found by the superior court) Berezyuk consented. During his search of the duffle, Gamache found the camera and the docking station. But Gamache also found other things that led him to suspect that Berezyuk was trafficking in drugs: coffee, party balloons, some empty vials, and personal lubricant.

Gamache then asked Berezyuk for permission to search his jacket. Again (according to the facts as found by the superior court) Berezyuk consented. In the jacket, Gamache found two bricks of heroin.

The total weight of this heroin was later determined to be slightly under 320 grams— the equivalent of slightly under 11 ½ ounces. According to testimony at Berezyuk's trial, this amount of heroin had a street value of up to a quarter of a million dollars.

Berezyuk initially told Gamache that this heroin was for his personal use—that he purchased the drug in bulk. However, Berezyuk ultimately conceded that the heroin was for distribution, and that he had agreed to transport the heroin for a drug dealer in Anchorage.

Based on the foregoing, Berezyuk was convicted of third-degree controlled substance misconduct (possession of heroin with intent to sell or otherwise distribute) and third-degree theft (theft of property worth at least $50 but less than $500) for the shoplifting of the camera.

In this appeal, Berezyuk argues that he never consented to the search of his duffle, and that (for this reason) the physical evidence discovered during the search of the duffle should be suppressed. Berezyuk also argues that he did not consent to the search of his jacket—or that, even if he did, his consent was tainted by the evidence discovered during the prior (allegedly unlawful) search of his duffle.

In addition, Berezyuk argues that all the statements he made to Gamache and his fellow officers should be suppressed because (1) he was subjected to custodial interrogation but he did not receive *Miranda* warnings; or, in the alternative, (2) even if he received *Miranda* warnings, he did not understand those warnings; or, in the alternative, (3) even if he did understand the *Miranda* warnings, he never affirmatively waived his rights; or, in the alternative, (4) even if he did waive his *Miranda* rights, the police improperly obtained his waiver through threats of deportation and increased punishment if he did not cooperate.

In addition, Berezyuk contends that even if there was no *Miranda* violation of any kind, his statements to the police were involuntary (for Fifth Amendment purposes) because they were induced by improper threats.

Finally, Berezyuk argues that there was insufficient evidence presented at his trial to support his conviction for theft of the camera.

For the reasons explained here, we reject all of Berezyuk's claims except the claim that his statements were improperly induced by threats. This claim is colorably supported by the record. However, we need not resolve this claim, because even if Berezyuk's statements to the police are suppressed, the remaining evidence of his guilt is overwhelm-

ing. Accordingly, any error in allowing the State to introduce those statements at Berezyuk's trial was harmless beyond a reasonable doubt.

*A prefatory note on our discussion of the underlying facts of Berezyuk's case*

In Berezyuk's opening brief, all of his assertions about the underlying facts of his case are supported by references to the testimony presented during his trial. However, the rulings that Berezyuk is attacking in this appeal were made *before* his trial, during the pre-trial litigation of his motions for suppression of evidence.

The judge who made those rulings, Superior Court Judge Larry D. Card, based his decision on the evidence presented during a pre-trial evidentiary hearing: the testimony of various airport police officers, plus the audio recording of the officers' interview with Berezyuk and the transcript of that recording (both of which were submitted in evidence).

In our analysis of Berezyuk's arguments, we have endeavored to locate support for Berezyuk's various assertions of fact by examining the evidence that was in front of Judge Card when he made his rulings. However, to the extent that Berezyuk has made assertions of fact that are *not* supported by the pre-trial evidence, we must disregard Berezyuk's assertions.

■ See *Waters v. State*, 64 P.3d 169, 171 (Alaska App.2003), where we held that a defendant may not attack a trial court's pretrial ruling on a suppression motion by using evidence developed at the defendant's ensuing trial, unless the defendant expressly asks the court to revisit its ruling in light of the trial evidence. As we stated in *Waters*, "[A] party challenging a trial court's ruling may not rely on an argument or on evidence that was not brought to the ... court's attention at the time the ... court made its ruling." *Ibid.*

*Berezyuk's argument that he did not consent to the search of his duffle*

■ At the beginning of Gamache's interview with Yuri Berezyuk in the lost and found office, Gamache told Berezyuk that he was not under arrest, but Gamache neverthe-

less advised Berezyuk of his *Miranda* rights. Before Gamache read the *Miranda* warnings, he told Berezyuk that he would answer any questions Berezyuk might have about those rights. Gamache then read the *Miranda* warnings and asked Berezyuk whether he understood his rights. Berezyuk replied that he did.

Gamache then asked whether Berezyuk, having these rights in mind, would be willing to answer some questions. Berezyuk's response is largely indiscernible in the audio recording; only the tail end of his response— "have the right"—can be understood. But immediately after this response, Gamache explained that he wanted to talk to Berezyuk about the theft of the camera the preceding night, and Berezyuk began responding to Gamache's questions. As we will describe more fully in a later section of this opinion, Judge Card concluded that Berezyuk waived his *Miranda* rights and consented to be interviewed.

Soon thereafter, Gamache told Berezyuk that the theft of the camera had been captured on the store's video surveillance camera. When Gamache said that he wanted to get the camera back, so that he could return it to the store, Berezyuk indicated that he had stolen the camera. Berezyuk explained that his decision to take the camera had been spur-of-the-moment, and that he did not discuss the theft with his brother Ivan beforehand.

About two minutes later, Berezyuk told Gamache that the stolen camera was in his duffle. Gamache then asked Berezyuk if he could "look through his bag". Berezyuk said something in response, but his words are indiscernible in the audio recording. Gamache then replied, "Okay".

This was immediately followed by a zipping sound—the sound of Gamache unzipping Berezyuk's duffle and commencing his search.

At the evidentiary hearing, Officer Gamache testified that when he asked Berezyuk for permission to search his duffle, Berezyuk gave consent for this search. (Berezyuk did not testify at the hearing.)

In his pre-trial suppression motion, Berezyuk argued that the search of his duffle was conducted without his consent. In the alternative, Berezyuk argued that even if he did consent to the search, he only consented because he did not believe he had the ability to refuse consent. In the further alternative, Berezyuk argued that even if he did consent, his consent was limited to a search for the stolen camera. Thus, Berezyuk contended, the search should have ended after Gamache located the camera and its docking station, and Gamache acted beyond the scope of Berezyuk's consent when he continued to search through the duffle and found the drug-trafficking items.

When Judge Card issued his ruling on Berezyuk's suppression motion, he found that Gamache asked Berezyuk for permission to "look through Berezyuk's bag". Judge Card acknowledged that Berezyuk's response to this request is not audible in the recording of the interview, but Judge Card deduced that Berezyuk must have answered "yes", since Gamache then responded "Okay", and then Gamache unzipped the duffle and began his search.

In reaching this conclusion, Judge Card noted that both Gamache and Berezyuk were using calm tones of voice. There was no indication of conflict between them, and Gamache's request for permission to conduct the search was not made in a threatening tone.

On appeal, Berezyuk argues that Judge Card was clearly erroneous when he found that Berezyuk affirmatively consented to the search of the duffle. Berezyuk notes that, in the audio recording, when Gamache asked for permission to search the duffle, Berezyuk's response is not audible. Berezyuk further notes that the State bore the burden of proving that Berezyuk consented to the search, and he argues that, because of this burden, Judge Card was required to presume that all the inaudible portions of the recording were unfavorable to the State.

Berezyuk also argues that it "borders on absurdity" to think that he, a resident alien who was subject to deportation if he committed a serious crime, "would simply . . . hand over all sorts of incriminating evidence" to the police.

Given all of these circumstances—*i.e.,* an inaudible response, a strong motivation to refuse consent, and the State's overall burden of proof—Berezyuk contends that no reasonable fact-finder could have concluded that the State met its burden of proving that Berezyuk consented to the search of the duffle.

We disagree. When Gamache asked Berezyuk for permission to conduct this search, Gamache had already informed Berezyuk that the theft of the camera had been captured on the store's surveillance video, and Berezyuk had already confessed to Gamache (1) that he was the one who shoplifted the camera, (2) that he still had the camera, and (3) that the camera was in his duffle. Moreover, even though Berezyuk's response is inaudible in the recording, Gamache testified at the evidentiary hearing that Berezyuk *did* consent to the search. Given all this, Judge Card could reasonably conclude that Berezyuk consented to the search of the duffle.

*Berezyuk's argument that, even if he did consent to a search of his duffle, Gamache's search of the duffle exceeded the scope of Berezyuk's consent*

■ In his opening brief, Berezyuk argues that even if he did consent to a search of his duffle, Gamache exceeded the scope of Berezyuk's consent when he continued to look through the duffle after he found the camera and the docking station—thus leading to the discovery of the items related to drug-trafficking.

This argument regarding the scope of Berezyuk's consent is contained in a single sentence of Berezyuk's opening brief. This sentence is not accompanied by any reference to the evidence presented in the superior court, nor any reference to Judge Card's findings, nor any further explanation of why Berezyuk's attorney thinks that Berezyuk's consent was limited to a search for the camera and docking station.

We note that the audio recording of the interview, as well as the evidentiary hearing testimony of both Officer Gamache and Officer Gary Delk (the other airport police offi-

cer who was present during Gamache's interview with Berezyuk), all support Judge Card's finding that Gamache asked for permission to "look through Berezyuk's bag", apparently without restriction.

We further note that, during the evidentiary hearing, when Berezyuk's attorney was cross-examining Officer Delk, the attorney asked Delk a question which seemingly acknowledged that Gamache had asked Berezyuk for broad permission to search the duffle. Specifically, the defense attorney asked Delk why Gamache would seek permission to look through Berezyuk's entire bag, when Berezyuk's brother Ivan had already told the officers the precise location within the bag where the camera was located.

Given these circumstances, we conclude that Berezyuk's single-sentence "argument", with no reference to the evidence presented in the superior court, or to Judge Card's finding on this issue, is insufficient to preserve this point. See *Wagner v. Wagner*, 218 P.3d 669, 678 (Alaska 2009), where the supreme court held that an issue was inadequately briefed when it was "contained in a single conclusory sentence, without citation to any authority." *See also Petersen v. Mutual Life Insurance Co. of New York*, 803 P.2d 406, 410 (Alaska 1990) ("Where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

*Berezyuk's argument that, even if he did consent to the search of his duffle and the search of his jacket, his consent was involuntary*

█ At pages 19–22 of his opening brief, Berezyuk presents an argument which he titles, "The search and purported consent were involuntary".

In the two-sentence opening paragraph of this argument, Berezyuk's attorney asserts, in conclusory fashion, that Berezyuk was "essentially forced to act on the state's behalf in conducting [the] warrantless searches [of his duffle and jacket]", and that "[Judge Card] erred in finding that [Berezyuk's] purported consents [to these searches] were voluntary."

This voluntariness argument was not raised in the superior court. In his pre-trial suppression motion, Berezyuk argued that his *confession* was involuntary because it was the result of improper threats. But Berezyuk did not argue that his consents to the searches of his duffle and jacket—searches that preceded his confession—were also involuntary. And because Berezyuk did not raise this claim in the superior court, Judge Card made no finding on this matter.

Moreover, other than the conclusory introductory paragraph that we have just quoted, the four pages that comprise this section of Berezyuk's opening brief contain no discussion of voluntariness. Instead, in these four pages, Berezyuk's attorney raises several other arguments—all aimed at showing that Berezyuk never consented to the searches *at all*:

(1) Berezyuk argues that it is absurd to think that he would consent to searches that he knew would reveal incriminating evidence;

(2) Berezyuk argues that the audio recording of the police interview had so many inaudible portions that no reasonable finder of fact could have concluded that the State had proved that Berezyuk gave his consent;

(3) Berezyuk argues that Judge Card erred by not holding the State to its burden of proof, and by not presuming that any inaudible or indiscernible portion of the audio recording should be construed against the State; and

(4) Berezyuk argues that even if he consented to the search of his jacket, that consent was tainted by the preceding unlawful search of his duffle.

We acknowledge that, within Berezyuk's single-paragraph argument of this last point—the argument that his consent to the search of the jacket was tainted by the preceding search of the duffle—there is one sentence that could be construed as addressing a true claim of involuntariness. Here is that paragraph, with the single pertinent sentence in italics:

Here, the state cannot show a break in the causal connection between the prior illegal search of [Berezyuk's] bag and [his] purported consent to [the] search [of his]

wallet and jacket.... The fact that [Officer] Gamache found evidence of drug trafficking [in Berezyuk's bag] was sufficient to overbear [Berezyuk's] will. He [*i.e.,* Berezyuk] was aware that Gamache suspected him of drug trafficking. *Then Gamache threatened [Berezyuk] with deportation, among other things.* The fact that Gamache had already recovered incriminating evidence [from Berezyuk's bag,] and was likely to use it against [Berezyuk], was sufficiently coercive to destroy [Berezyuk's] ability ... to resist [Gamache's requests for permission to search Berezyuk's wallet and jacket]. Therefore, [his] purported consent was involuntary and ineffective.

But the fact remains that Berezyuk never challenged the voluntariness of his consent during the trial court proceedings, and Judge Card made no finding on this issue (because no one asked him to).

Moreover, even though the title of this section of Berezyuk's brief declares that his consent was "involuntary", the italicized sentence quoted above is the sole sentence that could be construed as substantively addressing the issue of voluntariness. As we have explained, this sentence is hidden in the middle of a paragraph that is otherwise devoted to arguing that Berezyuk's consent to the search of his jacket was tainted by the preceding search of his duffle. This single sentence is unaccompanied by any further analysis of the facts of Berezyuk's case, nor is it accompanied by any discussion of the pertinent legal authorities on this issue. And the paragraph that contains this one relevant sentence is, itself, nestled within four pages of argument addressed to other topics.

Accordingly, we conclude that this issue is waived. *See Wagner,* 218 P.3d at 678; *Petersen,* 803 P.2d at 410.

*Berezyuk's claim that he never received Miranda warnings*

In Berezyuk's opening brief, he notes that he made self-incriminating statements while he was questioned by Officer Gamache. Berezyuk's brief then declares, "Because these admissions were made while in custody with no *Miranda* advisements, they are inadmissible."

Berezyuk provides no citation to the trial court record to support his assertion that he never received *Miranda* warnings. In fact, there is absolutely nothing in the record to support this assertion.

The evidence presented to the superior court indisputably establishes that Gamache advised Berezyuk of his *Miranda* rights at the very beginning of their conversation. Officer Gamache testified that he gave *Miranda* warnings to Berezyuk, and the audio recording of the interview clearly shows that the *Miranda* warnings were given. There was no contrary evidence. Judge Card expressly found that Berezyuk was advised of his *Miranda* rights.

(Indeed, in Berezyuk's suppression motion, he conceded that he *did* receive *Miranda* warnings. Berezyuk argued for suppression of his statements on the theories that he did not understand his rights, or that he did not affirmatively waive them, or (alternatively) that his waiver was coerced.)

For these reasons, we reject Berezyuk's contention that he was never advised of his *Miranda* rights.

*Berezyuk's contentions that, if he received Miranda warnings, he did not understand them—or, if he did understand his rights, he never waived them*

■ In Berezyuk's opening brief, he asserts that even though Officer Gamache may have advised him of his *Miranda* rights, the State failed to prove that Berezyuk ever validly waived his *Miranda* rights.

Berezyuk notes that in *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the United States Supreme Court explained that a valid waiver of *Miranda* rights has two components: the suspect must have understood "the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]", and the suspect's decision to waive these rights must have been "free and deliberate" rather than the product of "intimidation, coercion, or deception". 475 U.S. at 421, 106 S.Ct. at 1141.

In his brief, Berezyuk argues that the government failed to prove the *first* component of this test—the requirement that Ber-

ezyuk understood the nature of his rights and the consequences of waiving them.

Berezyuk notes that he is not a native speaker of English (his native language is Ukrainian), and he asserts that, because he had lived in the United States for only nine years preceding these events, he had "[a] limited comprehension of the American legal system". More particularly, Berezyuk's appellate attorney asserts that "the right to remain silent and the right to an attorney .... were unknown [in] Soviet Russia, and [were] unknown to [Berezyuk]."

These assertions—that Berezyuk did not understand his rights because of his difficulty with the English language, and because he had no previous knowledge of the right to silence and the right to an attorney—are not supported by any citations to the trial court record. This is because they have no support in the trial court record.

Berezyuk did not testify during the litigation of his suppression motion. And neither the testimony of Officer Gamache nor the testimony of Officer Delk—the two officers who interviewed Berezyuk—gives any indication that Berezyuk had linguistic difficulties that impeded the officers' communication with him. Moreover, even though one of the claims in Berezyuk's suppression motion was that he had unanswered questions about his *Miranda* rights, Berezyuk made no assertion that these unanswered questions arose from Berezyuk's difficulties with the English language.

We acknowledge that the audio record of Berezyuk's police interview does provide some arguable support for Berezyuk's claim that he had unanswered questions about his *Miranda* rights:

After Gamache finished reading the *Miranda* rights to Berezyuk, Gamache told Berezyuk that he would answer any questions Berezyuk might have about those rights. There was a slight pause in the conversation, and then Gamache asked Berezyuk whether he understood his rights. Berezyuk replied that he did.

But then, when Gamache asked whether Berezyuk, having these rights in mind, would be willing to answer some questions,

Berezyuk made a response that is largely indiscernible. Only the tail end of Berezyuk's response—"have the right"—can be understood. This portion of the audio record lends arguable support to the inference that Berezyuk had one or more questions about his rights.

But the record does not *establish* that Berezyuk had unanswered questions about his rights; the record is merely potentially ambiguous on this point because Berezyuk's response is largely indiscernible. Other portions of the record support a finding that Berezyuk understood his rights. Immediately after Berezyuk made his indiscernible response, Gamache explained that he wanted to talk to Berezyuk about the theft of the camera the preceding night, and Berezyuk began responding to Gamache's questions—thus suggesting that Berezyuk did not have unanswered questions, and that he was willing to begin talking to Gamache. Moreover, at the evidentiary hearing, Gamache testified (both on direct examination and on cross-examination) that Berezyuk waived his *Miranda* rights.

Based on this record, Judge Card found that Berezyuk had in fact told Gamache that he understood his rights. Judge Card also found, based on the fact that Berezyuk proceeded to answer Gamache's questions without hesitation or objection, that Berezyuk had indeed waived his *Miranda* rights.

As this Court recently noted in *Olson v. State*, 262 P.3d 227, 231 (Alaska App.2011), the circumstances of a custodial interrogation—"the actions and words of the person interrogated"—may give rise to a reasonable inference that the person waived their *Miranda* rights, even in the absence of an explicit waiver. Here, the record supports Judge Card's findings that Berezyuk understood his rights and waived them.

We accordingly reject Berezyuk's contentions that he did not understand his *Miranda* rights, or that he never waived his *Miranda* rights.

> *Berezyuk's contention that, if he waived his Miranda rights and agreed to answer the officers' questions, his decision to talk was involuntary because it was the result*

*of threats of deportation and increased punishment if he did not cooperate with the police*

Berezyuk's next contention is that, even if he waived his *Miranda* rights, the police obtained that waiver improperly—by threatening him with deportation · and increased punishment if he did not cooperate. To analyze this claim, we must examine (1) the underlying facts of the officers' interview with Berezyuk, (2) the way in which this claim was litigated in the superior court, (3) the way in which this claim was briefed on appeal, (4) the law relating to the forfeiture of appellate claims due to inadequate briefing, and (5) the law limiting claims of plain error when the claim is that physical evidence should be suppressed.

### (a) The underlying facts

The audio recording of Berezyuk's police interview indicates that, after Officer Gamache discovered the drug-related paraphernalia in Berezyuk's duffle (the coffee, the party balloons, the vials, and the personal lubricant), Gamache asked Berezyuk to explain the purpose of these items. Gamache told Berezyuk that these items made it appear that Berezyuk was involved in transporting drugs. Berezyuk responded to Gamache's questions, but his replies are not discernible in the audio recording.

At this point, Officer Delk joined the conversation. He told Berezyuk that the airport police might contact "the federal people" because the duffle contained these items of apparent drug paraphernalia. Officer Gamache then asked Berezyuk whether somebody was pressuring Berezyuk to bring drugs into Alaska. Berezyuk said no.

In response to a further question posed by Delk, Berezyuk disclosed that he was not a United States citizen; rather, he was a resident alien with a green card. Delk then informed Berezyuk that, if it turned out that Berezyuk was trafficking drugs and "not being truthful with the police", this could adversely affect Berezyuk's residency in the United States.

Delk told Berezyuk that he was not "threatening" him, but merely informing Berezyuk that if he did not cooperate with the police, and if he was not truthful, and if the police ended up contacting the federal authorities, the federal government "[might] revoke [his] citizenship [*sic*], [his] green card and everything, and deport [him]." Delk told Berezyuk that he was not saying that this would inevitably happen, but he wanted Berezyuk to know that this was a possibility. Here is the precise wording of this exchange:

*Delk:* You have a green card?

*Berezyuk:* Yeah.

*Delk:* Do you know what—especially if . . . we find out that you're being dishonest with us now . . .

*Berezyuk:* Well, I have a green card (indiscernible).

*Delk:* Well, hang on a sec. I'm just telling you what I know, okay? But if you're being dishonest with us, and . . . you're running . . . this drug operation . . . [and] you don't cooperate and tell . us what's going on here, and we end up contacting the federal government [about] this, and if the feds get into this thing, you could—I'm not saying that you *will,* you know; I'm not threatening you or anything. . . . I'm just saying [that] there's a concern with you trafficking [drugs]. And [if] you're not being truthful to us, and they're concerned about what's going on, they [might] revoke your citizenship [*sic*], your green card and everything, and deport you.

A few minutes later in the interview, Gamache obtained Berezyuk's permission to search his jacket, and that was when the police discovered the two bricks of heroin. Berezyuk told the officers that the two packages contained approximately three to four grams of heroin, and that this heroin was for his own personal use. But the two packages obviously contained much more than three or four grams of heroin.

(In fact, as we have already explained, the two packages (taken together) contained slightly less than 320 grams of heroin.)

Delk asked Berezyuk if this heroin was the reason he needed the balloons and the personal lubricant—to transport the heroin inside his body; Berezyuk replied "no".

At this point, Delk warned Berezyuk that he faced "hard time" if he was convicted of trafficking drugs. In response, Berezyuk again denied that he was involved in drug trafficking.

Delk then suggested that if someone else had put Berezyuk up to transporting the heroin, Berezyuk's cooperation "could go a long way". He also told Berezyuk that a drug-trafficking conviction could result in a sentence of twenty or more years.

A short time later, Delk repeated that if Berezyuk cooperated and told the police where he got the heroin, "something" could be worked out. But Berezyuk continued to deny that he was trafficking heroin. When Gamache suggested that the amount of heroin in Berezyuk's possession was too much for strictly personal consumption, Berezyuk responded that he bought the drug in quantity.

This discussion was interrupted by the arrival of the clerk who worked at the store where the camera was shoplifted. He identified Berezyuk, and he indicated that he wished to make a citizen's arrest for this misdemeanor offense.

When the conversation returned to the subject of the heroin, Berezyuk now confessed that he was transporting heroin for someone else. Berezyuk told the officers that he had gotten the heroin in Anchorage, and that the drug dealer who gave him the heroin threatened to have him deported if he did not transport the heroin.

Delk repeated that Berezyuk was facing a prison sentence of 20 years or more, and potential deportation. Gamache added that a person could do "a lot of living" in 20 years. He also told Berezyuk that a lot of "good people" were waiting to come to America—so if somebody was caught abusing their privilege of residency, they would do jail time and then they would get kicked out of the country. Delk then commented that if a person was deported and sent back to their home country, their situation might be much worse in that country.

At this point, Berezyuk became more forthcoming about where and how he had obtained the heroin.

Delk then suggested that Berezyuk should be concerned about what the drug dealers might do to him—because if the people who enlisted Berezyuk to transport the heroin found out that their drugs were gone, and that the police had seized their heroin, they would be angry about this loss, even if they believed that Berezyuk had not said anything to the police. After hearing this, Berezyuk disclosed the identity of the person who had given him the heroin, and he explained how he had gotten involved in transporting drugs for this person.

(b) The litigation of this claim in the superior court

In Berezyuk's suppression motion in the superior court, he argued that the officers' statements about the benefits of cooperation, and the potential consequences of not cooperating, constituted improper coercion that caused Berezyuk to waive his Miranda rights and respond to the officers' questions. Relying on the Alaska Supreme Court's decision in Beavers v. State, 998 P.2d 1040 (Alaska 2000), and this Court's decision in Jones v. State, 65 P.3d 903 (Alaska App.2003), Berezyuk argued that his waiver of Miranda rights was involuntary because he was essentially promised that he would not be charged with a drug-trafficking offense if he confessed, and he was told that his cooperation would make the difference between simply being deported and (on the other hand) serving 20 years in prison and then being deported. Berezyuk also argued that, for these same reasons, his confession should be deemed involuntary.

Based on these assertions, Berezyuk asked the superior court to suppress his statements. However, Berezyuk did not argue that the officers' coercive behavior should also lead to suppression of the physical evidence (i.e., the heroin found in his jacket).

Judge Card rejected Berezyuk's argument that the officers' statements were improperly coercive. The judge agreed that Berezyuk had been told that, if he was not truthful, he might be deported. The judge further agreed that, after Gamache found the heroin in Berezyuk's jacket, Berezyuk was told that "drug trafficking ... is a serious crime, and

that he should be truthful with the police ... because ... he didn't ... want [to be convicted of] a trafficking offense ... that might put him away for 20 years or more."

But Judge Card found that these statements were neither a threat of worse treatment if Berezyuk remained silent, nor a promise of better treatment if Berezyuk waived his rights and cooperated. Specifically, Judge Card declared that Berezyuk "wasn't promised that, by talking, he could get better treatment ... than if he didn't talk."

### (c) Berezyuk's briefing of this claim on appeal

As we just explained, Berezyuk argued in the trial court that the officers made improper threats and promises that gave rise to a *Miranda* violation and to an involuntary confession. The relief that he sought was suppression of his *statements*. Berezyuk did not argue that any physical evidence should be suppressed on account of these purportedly improper threats and promises.

In contrast, Berezyuk's opening brief to this Court does not present a claim of coercion. Twelve pages of Berezyuk's opening brief to this Court (about one-third of the brief) are devoted to the argument that his *Miranda* rights were violated in various ways—and that, as a result, his statements should be suppressed. However, even though Berezyuk's opening brief suggests various reasons why his understanding of his *Miranda* rights was flawed, and various reasons why his purported waiver of his *Miranda* rights was invalid, Berezyuk's opening brief does *not* argue that his *Miranda* waiver or his ensuing statements to the officers were coerced by improper threats or promises.

Among the twelve pages of Berezyuk's opening brief devoted to the *Miranda* issue, there are two sentences that refer to coercion. These sentences are not accompanied by a reference to any legal authority, apart from a citation to the Alaska Supreme Court's decision in *Hunter v. State*, 590 P.2d 888 (Alaska 1979)—a case which describes the test for determining when a suspect is in custody for *Miranda* purposes.

Moreover, reading these two sentences in context, it is not clear that Berezyuk is arguing that the police employed coercion to improperly obtain his statements. From the wording of the surrounding text, it appears that Berezyuk might be trying to argue that the officers' coercive statements provide support for his claim that he was *in custody* for *Miranda* purposes—because these statements made him feel that he was not at liberty to break off the questioning and leave.

The two sentences that we are describing are contained in a single paragraph, which we are about to quote. Before we do, we need to explain that, in this paragraph, Berezyuk's attorney falsely asserts that Officer Gamache threatened Berezyuk with the loss of his child unless he cooperated. Officer Gamache never said this (or anything like this) to Berezyuk. Rather, it was the *drug dealer* who made this threat to Berezyuk, in order to get Berezyuk to agree to transport the heroin for him. With this clarification, here is the text of the paragraph:

> Officer Gamache's statements to Yuri regarding his immigration status, [his] possible deportation, and having his child taken away from him [*sic*] reek[ ] of coercion, especially given the fact that he was in custody and [was] being interrogated. Under *Hunter,* Yuri could not have felt free to break off questioning and get up and leave. These factors are also indicative of coercive pressure.

After making the above-quoted assertions, Berezyuk's attorney immediately turns to a different argument—the argument that Berezyuk never affirmatively stated that he wished to waive his rights.

Berezyuk's briefing of the *Miranda* issue continues for another ten pages in his opening brief, but he never returns to the subject of potential coercion. And he never argues that the officers' alleged coercion should lead to the suppression of physical evidence—only the suppression of his statements to the officers.

In its responding brief, the State notes that even though Berezyuk challenged the voluntariness of his confession in the trial court, he failed to pursue that argument in

his opening brief, at least not in any meaningful way. Based on this, the State argues that this Court should consider Berezyuk's claim of coercion waived due to inadequate briefing.

We agree with the State that the two isolated sentences in Berezyuk's opening brief are insufficient to preserve a claim that his confession was involuntary. And if the State had stopped there, the decision of this appeal would be significantly easier.

But, in an abundance of caution, the State then proceeded to brief the question of whether Gamache's and Delk's statements to Berezyuk constituted improper threats or promises, and whether Berezyuk's statements to the officers were voluntary.

Apparently, the State's extensive discussion of this issue alerted Berezyuk's *second* appellate attorney—the attorney who wrote Berezyuk's reply brief—that here was an issue that Berezyuk should pursue. As a result, Berezyuk's reply brief contains a lengthy factual and legal argument (comprising thirteen pages) as to why Berezyuk's confession should be deemed involuntary (and should be suppressed) because it was the product of improperly coercive questioning.

Then, four pages later, in a single paragraph, Berezyuk's reply brief raises an issue that had never been raised before, either in the trial court or in the two preceding briefs: the claim that Berezyuk's consent to the search of his jacket—the search that yielded the bricks of heroin—was invalid because it was the product of Officer Delk's threats of deportation. This represents the first time, either in the trial court or on appeal, that Berezyuk has claimed that the officers' interrogation tactics should result in the suppression of physical evidence (as opposed to the suppression of Berezyuk's statements).

This new claim—the claim that the coercive aspects of the interrogation should result in suppression of the physical evidence, and not just suppression of Berezyuk's statements—has a potentially crucial effect on the outcome of this litigation. This is because Berezyuk's case is one of those rare instances where suppression of his confession, by itself, would not require us to reverse his conviction.

Berezyuk was convicted of possessing heroin with the intent to sell or distribute it. The amount of heroin in his possession was approximately 320 grams. According to the evidence at Berezyuk's trial, this amount of heroin was worth up to a quarter of a million dollars. Even if the jury never heard Berezyuk's confession that he was transporting this heroin for a drug dealer, it was obvious that this amount of heroin was intended for sale or distribution, and not merely for Berezyuk's personal use.

Thus, even if we concluded that Berezyuk was entitled to suppression of his statements, we would uphold his conviction on the basis that the error in admitting these statements was harmless beyond a reasonable doubt. But if Berezyuk were entitled to suppression of the heroin itself, then we would be obliged to reverse his conviction.

For this reason, we must decide whether Berezyuk's request for suppression of the heroin (as opposed to suppression of his statements) is properly before us in this appeal.

*(d) Why we conclude that Berezyuk's claim of involuntariness was forfeited because of his failure to adequately brief this claim in his opening brief*

 One of the precepts of appellate procedure is that an appellant is not allowed to raise new claims in their reply brief. Rather, the reply brief is meant to give the appellant a chance to further explain the claims already raised in their opening brief, or to respond to claims raised by the appellee. Thus, if a litigant raises a claim for the first time in their reply brief, that claim is deemed waived or forfeited (even if the claim was litigated in the lower court).[1]

This rule of forfeiture applies not only to claims that go completely unmentioned in the appellant's opening brief, but also to claims

1. *See, e.g., Diaz v. Alaska Dept. of Corrections,* 239 P.3d 723, 730 n. 30 (Alaska 2010); *Maines v. Kenworth Alaska, Inc.,* 155 P.3d 318, 326 (Alaska 2007) (issues raised for the first time in a reply brief are waived).

that receive only cursory discussion in the opening brief.[2]

■ On the other hand, when a claim is clearly identified and argued in the opening brief, this rule of forfeiture does not apply, even though the appellant's explanation or argument of this issue might be plainly deficient.[3]

■ Thus, the question of waiver often turns on an assessment of whether the appellant's discussion of the issue in their opening brief exceeds the confines of the "cursory". The supreme court has indicated that an appellant's discussion of an issue will be deemed sufficient if that discussion contains citations to pertinent legal authority supporting the appellant's argument,[4] and if the discussion contains a sufficient description of the operative facts so that the appellate court can understand what the claim is, and can understand the legal and factual bases of the claim.[5]

■ In contrast, when the opening brief merely mentions a claim, with no substantive argument of the issue, and with no citation to pertinent legal authority, the claim will be deemed waived.[6]

■ Turning to Berezyuk's case, and to the issue of whether Berezyuk's statements to the airport police should be deemed "involuntary" under the Fifth Amendment, we conclude that Berezyuk's opening brief does not contain a sufficient discussion of this issue to preserve this claim.

As we explained before, there are twelve pages of Berezyuk's opening brief devoted to the argument that Berezyuk's *Miranda* rights were violated in various ways. However, in these twelve pages, Berezyuk never argues that his statements were coerced by improper threats or promises, and thus were involuntary under the Fifth Amendment.

As we have explained, among the pertinent twelve pages of Berezyuk's opening brief, there are only two sentences that refer to coercion. These two sentences are conclusory, and they are not accompanied by a reference to any pertinent legal authority (*i.e.,* legal authority on the question of when a confession should be deemed involuntary for Fifth Amendment purposes).

If one were not already well-acquainted with the trial court record—specifically, if one did not already know that the issue of voluntariness *was* litigated in the superior court—one would never suspect that Berezyuk was trying to argue that something worse than a *Miranda* violation occurred in his case, and that his statements to Officers Gamache and Delk were involuntary for Fifth Amendment purposes.

We accordingly conclude that the passing mention of "coercion" in these two sentences in Berezyuk's opening brief is insufficient to preserve this claim for appeal.

---

**2.** *See Iverson v. Griffith,* 180 P.3d 943, 946 n. 12 (Alaska 2008) (holding that a litigant waived a due process claim when she mentioned this due process claim only in passing in her opening brief, and then attempted to develop the argument more fully in her reply brief); *Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991) (holding that when an issue is given only cursory treatment in the argument portion of an appellant's opening brief, the issue is waived, and the waiver is not correctable by arguing the issue in the reply brief).

**3.** *See Rofkar v. State,* 273 P.3d 1140, 1141–42 (Alaska 2012); *State v. Jacob,* 214 P.3d 353, 361–62 (Alaska 2009); *Maisy W. v. Alaska Office of Children's Services,* 175 P.3d 1263, 1267–68 (Alaska 2008); *Winschel v. Brown,* 171 P.3d 142, 151 n. 40 (Alaska 2007); *Anchorage Chrysler Center, Inc. v. DaimlerChrysler Corp.,* 129 P.3d 905, 913 n. 17 (Alaska 2006).

**4.** *See State v. Jacob,* 214 P.3d at 361–62.

**5.** *See Maisy W. v. Office of Children's Services,* 175 P.3d at 1267–68; *Winschel v. Brown,* 171 P.3d at 151 n. 40; *Anchorage Chrysler Center v. DaimlerChrysler Corp.,* 129 P.3d at 913 n. 17.

**6.** *See Zok v. State,* 903 P.2d 574, 576 n. 2 (Alaska 1995) (holding that where a litigant "provided no substantive argument on point in his opening brief, and only [explained] the court's alleged [error] in his reply brief," the issue was waived). *See also Peterson v. Ek,* 93 P.3d 458, 464 n. 9 (Alaska 2004), and *Petersen v. Mutual Life Insurance Co. of New York,* 803 P.2d 406, 410 (Alaska 1990) (issues that are raised only in a cursory fashion, without citing any pertinent legal authority, are waived).

The next question is whether the State saved Berezyuk from the consequences of this waiver when the State chose to brief the voluntariness issue.

As we explained earlier, the State's brief contains two arguments on this point: first, that Berezyuk's briefing of the issue was inadequate to preserve the claim, and second, that there was no merit to the claim in any event. The State was able to make this second argument because the issue was litigated in the superior court, and was decided by Judge Card.

One might argue that, because both sides were ultimately able to brief this issue (the State in its brief, and then Berezyuk in his reply brief), there is no unfairness in allowing Berezyuk to litigate the claim. But the *order* in which the issue was briefed does potentially prejudice the State.

Here, the State was required to speculate, to a certain extent, as to exactly how Berezyuk might argue this issue on appeal. It is true that Berezyuk filed a suppression motion in the trial court addressing this issue, but Berezyuk's motion was filed *before* the evidentiary hearing, and before Judge Card made his findings. Thus, the State could not know for sure (1) precisely what evidence Berezyuk would rely on in his appellate argument, (2) whether Berezyuk would take issue with any of Judge Card's findings of fact, and (3) which aspects of Judge Card's legal analysis Berezyuk would attack.

An appellee (that is, the party responding to an appeal) is entitled to know what legal and factual arguments the appellant is relying on. When the appellant's brief does not specify these matters, the appellee is placed at a disadvantage; the appellee is essentially forced to guess how the appellant might wish to attack the trial court's ruling—forced to anticipate the arguments that the appellant might raise in their reply brief.

It is true, as our supreme court recently indicated in *Rofkar v. State*, 273 P.3d 1140 (Alaska 2012), that an appellate court has the authority to vary its procedure and allow an appellee in this situation to file yet another brief—a brief responding to the arguments contained in the appellant's reply brief. But

we do not interpret *Rofkar* as saying that this kind of procedure should be followed in cases where the appellant's opening brief is insufficient to preserve the issue in the first place.

In *Rofkar*, the supreme court did not repudiate or cast doubt on its line of decisions holding that an appellant forfeits a claim if that claim is not mentioned, or is given only cursory attention, in the opening brief. Rather, the supreme court concluded that Rofkar's claim should be litigated because Rofkar's discussion of this claim in his opening brief *was* sufficient to preserve the claim (even though that discussion was deficient in certain ways). *See Rofkar*, 273 P.3d at 1142: "[W]hen an appellant *adequately raises an issue in the opening brief,* the fact that the appellant does not argue that important [case] authority must be overruled, or distinguished, until [the] reply brief does not justify [an appellate court] in refusing to consider the issue on the merits." (Emphasis added)

In Berezyuk's case, the passing mention of "coercion" in his opening brief was *not* adequate to raise the claim that his statements were involuntary. The State, out of caution, chose to brief the voluntariness issue because the State could not be sure that we would agree with its primary contention that the issue was abandoned. If we were to hold that the State, by briefing the merits of this issue, thereby waived its right to argue that the issue was abandoned, we would simply encourage irregular appellate procedure— and, potentially, we would also encourage gamesmanship in briefing by appellees.

*(e) Why we conclude that, even if Berezyuk should be allowed to litigate the claim that his statements were involuntary, he is nevertheless precluded from arguing that the heroin found in his jacket should also be suppressed on this basis—because that claim was not raised in the trial court, nor was it raised in his opening brief*

As we have already explained, Berezyuk argued in the superior court that his *confession* should be deemed involuntary (and should be suppressed) because it was the product of improperly coercive questioning—in particular, the officers' statements

suggesting that Berezyuk would face deportation and a lengthy prison sentence unless he was honest and cooperative with the officers.

But Berezyuk did not argue that the officers' statements affected the voluntariness of his consent to the search of his jacket—the search that uncovered the bricks of heroin. Berezyuk argued only that his *statements* were the result of improper coercion. As a result, Judge Card made no ruling on the question of whether Berezyuk's consent to the search of his jacket might be viewed as involuntary.

Likewise, neither Berezyuk's opening brief nor the State's responding brief addressed the issue of whether the heroin should be deemed the fruit of improperly coercive statements. This possibility was not raised until Berezyuk's second appellate attorney identified this issue in Berezyuk's reply brief.

As we have also explained, this new claim—the claim that the coercive aspects of the interrogation should result in suppression of the physical evidence, and not just suppression of Berezyuk's statements—has a potentially crucial effect on the outcome of this litigation. Suppression of Berezyuk's confession, by itself, would not require us to reverse his conviction. The heroin in Berezyuk's possession was worth up to a quarter of a million dollars. Even if the jury never heard Berezyuk's confession that he was transporting this heroin for a drug dealer, it was obvious that this amount of heroin was intended for sale or distribution, and not merely for Berezyuk's personal use.

Thus, any error in admitting Berezyuk's *statements* would be harmless beyond a reasonable doubt. But if Berezyuk were entitled to suppression of the heroin itself, then we would be obliged to reverse his conviction.

We conclude that Berezyuk forfeited the claim that the heroin should be suppressed by failing to raise this claim in the superior court, and by failing to raise this claim in his opening brief. We reach this conclusion for three reasons.

First, Berezyuk's failure to raise this claim in the trial court meant that Judge Card never made findings regarding the facts that would be necessary to analyze this claim.

Here, we need to explain (or emphasize) that Officers Gamache and Delk made a *series* of potentially coercive statements to Berezyuk. Berezyuk consented to the search of his jacket in the *middle* of this series of statements, but he did not confess that he was transporting heroin for a drug dealer until the *end* of the series of questionable statements.

This is not a situation where Berezyuk heard an entire series of potentially coercive statements and then he decided to both confess and allow the police to search his jacket. If that had been the situation, then the only question would be whether the series of coercive statements, taken as a whole, overbore Berezyuk's will—and, if so, then both his statements and the physical evidence should be suppressed.

But here, Berezyuk had heard only a few of the potentially coercive statements when he consented to have Officer Gamache search his jacket. Thus, the evidence pertaining to the voluntariness of that consent was different from the evidence pertaining to the voluntariness of his later confession.

Equally as important, the record of the interrogation shows that Berezyuk continued to resist the officers' interrogative efforts, and continued to deny that he was a drug courier, even *after* Gamache discovered the heroin in Berezyuk's jacket. Even though the officers now had the bricks of heroin, Berezyuk continued to insist that this was only a small amount, and that the heroin was purely for his personal use. In other words, he continued to oppose the officers—thus indicating that his will was *not* overborne, at least at that point in the interrogation.

See *Edwards v. State,* 842 P.2d 1281, 1285 (Alaska App.1992), and *Malloy v. State,* 1 P.3d 1266, 1276 (Alaska App.2000), where we rejected the defendants' claims of involuntariness because, despite the officers' potentially coercive statements, the defendants continued to protest their innocence.

For these reasons, the answer to whether Berezyuk's *statements* should be suppressed as involuntary does not necessarily yield the

answer to whether the *heroin* should be suppressed. It therefore follows that Berezyuk's failure to explicitly raise this issue in the trial court should preclude him from raising this issue on appeal.

The second reason why Berezyuk should be precluded from challenging the admissibility of the heroin for the first time on appeal is the Alaska Supreme Court's decision in *Moreau v. State*, 588 P.2d 275 (Alaska 1978). In *Moreau*, the supreme court held that claims involving the exclusionary rule are "not appropriately raised for the first time on appeal." *Id.* at 280. The supreme court explained:

> The exclusionary rule is not the type of doctrine designed to protect against conviction of the innocent. Rather, it is a prophylactic device to curb improper police conduct and to protect the integrity of the judicial process. Thus, justice does not generally require that it be applied on appeal where it is not urged at trial or where new grounds for its invocation are presented on appeal.

*Moreau*, 588 P.2d at 280.

As the *Moreau* decision points out, there is a significant difference between coercive police conduct that leads to a confession and coercive police conduct that leads to the discovery of physical evidence. The confession is *untrustworthy* because it is the product of coercion, and it is therefore improper for the trier of fact to rely on this evidence. But physical evidence obtained through police misconduct retains its probative value. This evidence is withheld from the jury, not because it is unreliable, but rather to deter police misconduct. Therefore, even if the defendant can identify a ground for suppressing this evidence on appeal, this does not impugn the fairness of the fact-finding process at the defendant's trial, and so there is no plain error.

Third and finally, the claim under consideration—whether the heroin should have been suppressed on the basis that it was the fruit of police coercion—was not raised until Berezyuk's reply brief. And, as we have explained, claims raised for the first time in a reply brief are waived.

For these three reasons, we conclude that even if Berezyuk should be allowed to litigate the voluntariness of his *statements,* he is still precluded from litigating the voluntariness of his consent to the search of his jacket, and from seeking suppression of the heroin on this basis.

And because any error in admitting Berezyuk's statements at trial was harmless beyond a reasonable doubt (given the evidence that he possessed a quarter-million dollars' worth of heroin), we conclude that Berezyuk's conviction for possessing heroin with intent to distribute should be affirmed.

*The sufficiency of the evidence to support Berezyuk's conviction for the theft of the camera*

██ Berezyuk argues that the evidence presented at his trial was legally insufficient to support his conviction for stealing the camera from the store at the airport. Specifically, he argues that the camera might have been taken by his brother, Ivan.

But when a defendant claims that the evidence is insufficient to support a criminal conviction, an appellate court must decide that claim by viewing the evidence in the light most favorable to the jury's verdict, even though contrary evidence may have been presented at trial.[7] Viewing the evidence at Berezyuk's trial in that manner, the evidence was sufficient to support Berezyuk's conviction for theft.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

7. *See, e.g., Richards v. State*, 249 P.3d 303, 304–05 (Alaska App.2011); *Rantala v. State*, 216 P.3d 550, 562 (Alaska App.2009).